# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

**Civil Action No. 3:26-cv-__________**

| | |
|---|---|
| **ELIZABETH HOBSON,**<br>Plaintiff,<br>v.<br>**MORGAN STANLEY SMITH BARNEY, LLC d/b/a MORGAN STANLEY,**<br>Defendant. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Elizabeth Hobson ("Plaintiff" or "Ms. Hobson"), by and through her undersigned counsel, complaining of Defendant Morgan Stanley Smith Barney, LLC d/b/a Morgan Stanley ("Morgan Stanley," the "Firm," or "Defendant"), alleges as follows:

## PRELIMINARY STATEMENT

1. This is an action for disability discrimination, failure to accommodate, sex discrimination, hostile work environment, retaliation, interference with protected medical leave, constructive discharge, and unlawful wage deduction arising under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 et seq. (the "ADA"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. (the "FMLA"), the North Carolina Wage and Hour Act, N.C. Gen. Stat. § 95-25.1 et seq. (the "NCWHA"), and North Carolina common law.

2. Plaintiff is a financial professional with more than fifteen years of experience in the financial industry, with a practice focused on structured settlements, special needs planning and estate transfer, wealth management, and tax-advantaged portfolio management. Before the events

described in this Complaint, Plaintiff had never been terminated from a job, never been reprimanded for her job performance, and never received a negative performance review. She was one of the most decorated Financial Advisors in her branch and complex — a Wealth Management Pacesetter's Club honoree in 2019, 2021, 2022, 2023, 2024, and 2025, missing the award only in 2020, the year her recovery from cervical spine surgery required her absence from the office — who, by metrics Morgan Stanley's own Complex Manager handed to her in January 2024, ranked at the top of her complex for net new assets, client retention, client contact, and revenue growth. Additionally, Plaintiff received merit-based promotions to Senior Portfolio Manager, Insurance Planning Director, and Vice President of Wealth Management. Rather than support her, Morgan Stanley's branch and complex management subjected her to an escalating, years-long pattern of discrimination, targeting, and retaliation because of her sex and her disabilities: they strung out for years even the most modest accommodations for her serious, surgically documented cervical spine condition; they interrogated her about her surgeries and pressured her to physically display her surgical incisions; they disclosed her actual home address — legally shielded under North Carolina's Address Confidentiality Program because she is a survivor of domestic violence — and her personal phone number; they called her "a girl" who could not "handle" her job; and they stripped tens of millions of dollars of client assets from her book of business and directed them to a male advisor whose documented history of threats and harassment was known to Morgan Stanley's own Legal Department.

3. This case is also a paradigm of a corporate Human Resources and Employee Relations apparatus deployed not to protect employees, but to protect management. On paper, Morgan Stanley maintains the full architecture of employee protection: Human Resources, Employee Relations, an "Alternative Resolutions" team, an accommodations "process," risk officers, and

hotlines. In practice, as Plaintiff's meticulously documented experience shows, that architecture operated as a labyrinth — an endless loop of forms, case numbers, 800 numbers, "processes," and "investigations" — designed to exhaust the complaining employee while the information she supplied in good faith was collected, distorted, and weaponized against her. When Plaintiff reported discrimination and retaliation, she — not the wrongdoers — became the subject of investigation. When she submitted accommodation requests supported by her surgeons, she was told, falsely, that she had never "submitted a case." When she asked for help, she was told to fill out more forms. And when Employee Relations finally closed her accommodations request, it did so while she was out of the office — scheduling "discussions" during her surgery, the day after her father's death, and the hour she returned from bereavement leave before his funeral — and then blamed her for failing to "participate."

4. Plaintiff complained repeatedly — internally, through the Firm's own channels, and through counsel — and waited in good faith for Human Resources and Employee Relations to intervene. Morgan Stanley's own intake records confirm both her complaints and her fear of reprisal: the Firm's February 2024 "Hot Topic" record of her hotline complaint memorializes her report that her manager "took most of her book of business due to her having surgery," that he "gave the business to others even though FA comp and HR told the manager not to," that "he is retaliating," and that she "would prefer that HR reach out to her first, as she does not want more retaliation." Instead of intervening, Morgan Stanley circled the wagons and protected the management team responsible for the misconduct. Worse, after Plaintiff complained, the short-term disability claim she had submitted in February 2024 was denied, her leave was retroactively converted to unpaid status, and her family's health insurance and prescription drug benefits were

cut off — retroactively, without meaningful notice, and without any offer of COBRA continuation coverage — while Morgan Stanley unilaterally debited thousands of dollars from her paycheck.

5. By June 2025, the discrimination, retaliation, and failure to accommodate had made it impossible for Plaintiff to service her clients, had adversely impacted her ability to support her family, and had caused a substantial deterioration of her health. On June 3, 2025, having exhausted every internal avenue, Plaintiff was left with no reasonable alternative but to resign. Her working conditions had become so intolerable that a reasonable person in her position would have felt compelled to resign; her separation was, in law and in fact, a constructive discharge.

6. Plaintiff timely exhausted her administrative remedies before the U.S. Equal Employment Opportunity Commission ("EEOC") and brings this action within ninety (90) days of her receipt of the EEOC's Notice of Right to Sue.

## JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 2000e-5(f)(3), 42 U.S.C. § 12117(a), and 29 U.S.C. § 2617(a)(2). This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a).

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the unlawful employment practices alleged herein were committed in this District, the relevant employment records are maintained and administered in this District, and Plaintiff worked for Defendant in this District at Defendant's Cornelius, North Carolina branch office, in Mecklenburg County. This action is properly assigned to the Charlotte Division because the claims arose in Mecklenburg County.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES AND TIMELINESS

9. On or about November 1, 2024, Plaintiff executed and timely filed a Charge of Discrimination with the EEOC against Morgan Stanley Smith Barney, LLC d/b/a Morgan Stanley, EEOC Charge No. 430-2025-00440, alleging discrimination on the basis of disability and sex and retaliation, and describing in its particulars a continuing course of discriminatory and retaliatory conduct — including the denial of accommodations, the disclosure of her confidential address, the raiding of her book of business, interference with her medical leave, the Letter of Reprimand, and the September 2024 denial of disability benefits and retroactive cancellation of her insurance benefits — through the date of filing. Plaintiff thereafter twice amended the Charge, encompassing Defendant's continuing and subsequent conduct, including the conduct culminating in her June 3, 2025 constructive discharge. Prior to filing the Charge, Plaintiff and Defendant entered into a tolling agreement effective August 2, 2024.

10. On or about May 19, 2026, the EEOC issued Plaintiff a Notice of Right to Sue, which Plaintiff received on or about May 19, 2026. This action is filed within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue. A true and correct copy of the Notice is attached as Exhibit A.

11. The hostile work environment alleged herein constitutes a single, continuing unlawful employment practice; because acts contributing to that hostile environment occurred within the applicable charge-filing period (as extended by the parties' tolling agreement), the entire scope of the hostile environment, including conduct predating the charge-filing period, is properly before this Court. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). Independently, numerous discrete acts alleged herein occurred within the charge-filing period, including without limitation: Plaintiff's February 2024 protected complaints and the retaliation that followed; the

February–March 2024 removal of client accounts and revenue from Plaintiff's book; the February 5, 2024 threat to fabricate a customer complaint against her; Defendant's interference with Plaintiff's February 27–April 3, 2024 medical leave; the April 2024 removal of her specialty client and dissolution of her joint production arrangement; the June 2024 closure of her accommodations file; the August 6, 2024 Letter of Reprimand; the September–October 2024 benefits cancellation, unpaid-leave redesignation, and unauthorized paycheck deduction; the continuing denial of accommodations through the end of her employment; the 2025 denial of support staffing; the April 2025 transfer of her clients to her Branch Manager; and her June 3, 2025 constructive discharge, from which the limitations period runs anew. Conduct predating the charge-filing period is further alleged as relevant background evidence of Defendant's discriminatory and retaliatory animus and pattern of conduct.

12. Plaintiff's statutory employment discrimination claims are not subject to mandatory arbitration. FINRA Rule 13201(a) provides that a claim alleging employment discrimination in violation of a statute is not required to be arbitrated under the FINRA Code of Arbitration Procedure for Industry Disputes unless the parties have agreed to arbitrate it.

## PARTIES

13. Plaintiff is a citizen and resident of Mecklenburg County, North Carolina. At all relevant times, Plaintiff was employed by Defendant as a Financial Advisor in Defendant's Cornelius, North Carolina branch office, within the Carolinas Complex, and was an "employee" within the meaning of 42 U.S.C. § 2000e(f), 42 U.S.C. § 12111(4), 29 U.S.C. § 2611(2) (having been employed by Defendant for more than twelve months and having worked at least 1,250 hours in the twelve months preceding each period of FMLA-protected leave, at a worksite at which, or

within 75 miles of which, Defendant employed 50 or more employees), and N.C. Gen. Stat. § 95-25.2(4).

14. Defendant Morgan Stanley Smith Barney, LLC d/b/a Morgan Stanley is a Delaware limited liability company registered to do business in North Carolina, with branch offices in this District, and may be served through its registered agent, CT Corporation System, 160 Mine Lake Court, Suite 200, Raleigh, North Carolina 27615-6417. At all relevant times, Defendant employed more than 500 employees and was an "employer" within the meaning of 42 U.S.C. § 2000e(b), 42 U.S.C. § 12111(5), 29 U.S.C. § 2611(4), and N.C. Gen. Stat. § 95-25.2(5).

15. At all relevant times, the individuals identified herein — including Curtis Mason, Market Executive for the Carolinas Complex ("Complex Manager"); Caresse Blevins Associate Complex Manager for the Carolina's Complex, Robert Pawlowski, Senior Vice President and Cornelius Branch Manager; former Cornelius Branch Manager Ebony Moore; Complex Risk Officers John Poor and Anthony Vigliotti; Complex Head Administrator Amy Freeman; and Human Resources and Employee Relations personnel including Human Resources Director Tiffany Allbrook, Raquel Rosales-Vinalay, Jeanne Cho, Raquelle Dickson, and Monique Simmons — acted within the course and scope of their employment and agency with Defendant, and their acts and omissions are attributable to Defendant.

## FACTUAL ALLEGATIONS

### *A. Plaintiff's Employment and Record of Excellence*

16. Plaintiff was hired into the Financial Advisor Associate ("FAA") Program at Morgan Stanley's Cornelius (Lake Norman), North Carolina branch in or about June 2016. She successfully completed the program and was promoted to Financial Advisor, and was thereafter promoted to Senior Portfolio Manager and Insurance Planning Director.

17. Plaintiff partnered with Dana Timchenko, a fellow Financial Advisor, and the two shared responsibilities for their joint clients under a joint production number ("JPN") and Firm recognized Team. Plaintiff built a decorated, fast-growing practice: she earned Morgan Stanley's Wealth Management Pacesetter's Club recognition in 2019, 2021, 2022, 2023, 2024, and 2025 for her exceptional performance and client service. On February 11, 2025, the Firm again awarded Plaintiff Pacesetter recognition — presented by Complex Manager Curtis Mason himself, even as the discriminatory and retaliatory conduct alleged herein was ongoing. By metrics Morgan Stanley's own Complex Manager presented to her in January 2024, Plaintiff ranked at the top of the complex for net new assets, client retention, client contact, and revenue growth — the very measures of a growing advisory practice — and she achieved that growth while servicing her clients through four cervical spine surgeries and while being denied the support afforded to her peers.

18. Throughout the events described herein, Plaintiff scrupulously followed Morgan Stanley's own reporting systems, policies, and "processes" — submitting the forms she was told to submit, calling the numbers she was told to call, participating in every "discussion" that was actually scheduled while she was available, and contemporaneously documenting her requests and the Firm's responses in writing. That documentation — emails, recorded and transcribed mandatory meetings, calendar records, and the Firm's own written admissions — corroborates the allegations herein.

***B. Morgan Stanley's Institutional Knowledge of Jeremy McPherson's Threatening and Harassing Conduct***

19. In May 2017, Financial Advisor Dana Timchenko left UBS Financial Services and joined Morgan Stanley's Cornelius branch. Upon information and belief, Ms. Timchenko left UBS

abruptly because of threats and constant ~~sexual~~ harassment directed at her by UBS Financial Advisor Jeremy McPherson.

20. In or about June and July 2017, Plaintiff was called out of an FAA meeting by Morgan Stanley compliance and complex management regarding a restraining order proceeding initiated by UBS after one of McPherson's clients followed Ms. Timchenko to Morgan Stanley. In connection with that proceeding, Ms. Timchenko provided Morgan Stanley's Legal Department with evidence of McPherson's threats and constant harassment of her — the reason she had left UBS abruptly. UBS thereafter dropped the restraining order proceeding and did not contact Ms. Timchenko again.

21. Accordingly, since at least 2017, Morgan Stanley's Legal Department has been aware of McPherson's threatening and harassing conduct.

22. Upon information and belief, Curtis Mason — who was named Market Executive for the Carolinas Complex in April 2022 — and McPherson are long-time friends who previously worked together at Merrill Lynch. In May 2023, Mason hired McPherson into Morgan Stanley notwithstanding the Firm's institutional knowledge of McPherson's history of threats and harassment. As set forth below, Mason thereafter systematically stripped client relationships from Plaintiff and directed them to McPherson and his team.

***C. Plaintiff's Disabilities and Morgan Stanley's Years-Long Failure to Accommodate Them***

23. Plaintiff suffers from multiple serious neck injuries originally inflicted through domestic violence during a previous marriage, which were aggravated by a car accident and further exacerbated by multiple failed surgical procedures intended to relieve the condition. As a result, Plaintiff has suffered excruciating pain and limited mobility in her neck.

24. Plaintiff's cervical spine conditions have required four surgeries: (i) a first cervical disc surgery in 2017; (ii) a posterior fusion and anterior fusion of C4–C7 performed by Dr. Daniel Riew of Weill Cornell / NewYork-Presbyterian Hospital from May 31 to June 7, 2021, with a recommended minimum recovery of seven months; (iii) a third surgery performed by Dr. Riew in New York in June 2022; and (iv) after the fusion failed to heal (a third non-union, confirmed in November 2023 by Dr. Riew and by fusion-revision specialist Dr. Cuellar, with no bone growth and hardware screws moving), a revision surgery performed by Dr. Jason Cuellar (Cuellar Spine, Jupiter, Florida) beginning December 7, 2023, in which Plaintiff's posterior instrumentation and hardware were removed and an artificial disc was implanted, through an incision running from the top of her neck through her shoulders.

25. At all relevant times, Plaintiff's cervical spine conditions constituted physical impairments that substantially limited one or more major life activities, including but not limited to lifting, reaching, standing, sleeping, concentrating, and working, and substantially limited the operation of major bodily functions, including neurological and musculoskeletal functions; Plaintiff also had a record of such impairments and was regarded by Defendant as having such impairments. Plaintiff was, at all times, a qualified individual with a disability who could perform the essential functions of the Financial Advisor position with or without reasonable accommodation — as her sustained, award-winning production conclusively demonstrates. Indeed, in its August 6, 2025 position statement to the EEOC, Defendant conceded that Plaintiff "can arguably establish that she is disabled."

26. Morgan Stanley knew how to accommodate Plaintiff — because it once did. When Plaintiff had her first cervical surgery in 2017, she took MetLife short-term disability for five weeks without incident: her then-Branch Manager covered Plaintiff's book, assisted with the

disability process, and even onboarded a new client for her. Plaintiff returned to her position, continued performing her job with positive feedback from her employer, and suffered no adverse consequences.

27. The Firm's treatment of disability leave changed as branch management changed. In 2018, Plaintiff took three weeks of MetLife disability leave for a broken right foot and severed Achilles tendons. Branch Manager trainee Ray Givens failed to toll Plaintiff's revenue requirements under the FAA Program during her protected leave; Plaintiff returned to "does not meet" status and was nearly terminated. Givens — who was required to meet asset and revenue thresholds to keep his position — was let go after a year.

28. In connection with her May–June 2021 surgery — for which her surgeon recommended a minimum of seven months off — Plaintiff raised the prospect of short-term disability leave with then-Branch Manager Ebony Moore. Rather than support a leave, Moore steered Plaintiff away from it, telling Plaintiff to simply put her out-of-office notification on instead; Plaintiff took no short-term disability or paid leave and continued to work during this period, working with her partner, Ms. Timchenko, to service their joint clients when Plaintiff was in too much pain to take calls. Plaintiff later learned that Moore was a Branch Manager trainee required to meet specific asset and revenue thresholds — and that if Plaintiff took disability leave, Plaintiff's revenue would stop counting toward Moore's numbers until Plaintiff returned full time. Moore's "accommodation" advice served Moore's own compensation metrics, not Plaintiff's health.

29. Plaintiff consequently worked through her 2021 surgical recovery in severe pain, unable to use her left arm. When she asked Moore for assistance, Moore offered none — instead interrogating Plaintiff about her medication — and, on a call the day before Thanksgiving 2021,

screamed at Plaintiff so loudly that Plaintiff's family overheard the entire conversation. Moore left the branch a week later, and the Cornelius branch had no Branch Manager for over a year.

30. In or around April 2022, Curtis Mason, Market Executive, and Robert Pawlowski, Senior Vice President, became Plaintiff's supervisors. The lesson Morgan Stanley had taught Plaintiff by then was unmistakable: taking disability leave endangered her career. So when Plaintiff underwent her third cervical surgery in June 2022, out of fear that extensive leave would affect her employment, she took no disability leave at all — she took only four days off, placing her out-of-office notification on — and she remained in severe pain for months following the surgery. Pawlowski and Mason had "no problem" with this arrangement — an arrangement under which a top advisor worked through spinal surgery rather than exercise her statutory rights.

31. Upon the advice of her physician, in December 2022, Plaintiff requested reasonable accommodation in the form of a standing desk and the ability to work from home. On December 29, 2022, following a post-surgical consultation in New York, Dr. Riew instructed that Plaintiff needed additional time to heal and that she could not look down; Plaintiff provided Dr. Riew's note to Human Resources and branch management.

32. The standing desk was never provided in response to that request. When Morgan Stanley offered standing desks to Plaintiff's branch free of charge following a reduction in the E*TRADE workforce — desks provided to advisors, operations staff, and support staff without any accommodation request at all — Plaintiff requested one and did not receive it. Plaintiff thereafter renewed the request repeatedly, even offering in writing to purchase and install a standing desk at her own expense, "as the free option was not provided." For more than two and a half years after her surgeon first supported the request, no standing desk was provided. To the extent Defendant contends that it finally placed a standing desk in Plaintiff's office in or around

August 2024 — after her February 2024 discrimination complaints, after counsel's involvement, and years after the request — that belated gesture confirms, rather than cures, the violation.

33. As to the work-from-home request, in February 2023 Human Resources approved only a temporary, three-month remote-work arrangement. Plaintiff objected that a three-month window was inconsistent with her surgeon's instructions for a longer recovery, and she continued to pursue a durable accommodation through the Firm's "process." No permanent or medically adequate accommodation was ever approved: as set forth below, the Firm left Plaintiff's renewed requests "under review" indefinitely, rejected her October 2023 request in its Alternative Work Location ("AWL") system on December 20, 2023 on the stated — and false — ground of an "ongoing conversation," conditioned her safety-sensitive request on the disclosure of her confidential address and sealed domestic-violence proceedings, and ultimately closed her accommodations file while she was on bereavement leave. Plaintiff thereafter spoke with Human Resources (including Human Resources Director Tiffany Allbrook) at least twice regarding the standing desk and the work-from-home accommodation, followed every instruction and requirement she was given, and on February 23, 2023 confirmed with Ms. Allbrook that all requirements had been submitted.

34. In the fall of 2023, Plaintiff learned her fusion had failed. On November 26, 2023, Plaintiff visited fusion-revision specialists regarding her failed past surgeries, who confirmed the prior fusion was unsuccessful — no bone growth at all, with the two screws holding the level moving — a condition that had caused severe pain and disability for eighteen months; on November 27, 2023, Dr. Riew confirmed the non-union, Plaintiff's third. Eager for relief, Plaintiff was able to book revision surgery with Dr. Cuellar for December. When insurance approved part of the surgery on December 5, 2023, Cigna confirmed in writing that Plaintiff had 48 hours from

approval to get to Florida due to a last-minute cancellation. Plaintiff was required to pay $65,000 out of pocket.

35. On December 6, 2023, Plaintiff emailed Complex Manager Curtis Mason and Branch Manager Robert Pawlowski advising that she would be out of the office for the surgery and that she planned to continue checking her emails periodically. Plaintiff specifically recalls sending this email and specifically recalls that Mr. Mason responded to it — with Mr. Pawlowski copied — confirming that management was aware she would be out for surgery. Although Plaintiff no longer has access to her Morgan Stanley email account and cannot retrieve the message herself, both the email and Mr. Mason's written response were sent and received on Defendant's own email systems, which Defendant controls. Defendant's assertion to the EEOC that a "thorough search" of Plaintiff's emails "could not locate any such emails" is therefore troubling: either the search was inadequate, or Defendant has failed to preserve records squarely within its custody and control. Plaintiff also emailed Complex Head Administrator Amy Freeman and Human Resources Director Tiffany Allbrook regarding her upcoming absence. Ms. Allbrook instructed Plaintiff to be sure to submit her accommodations request — which Plaintiff did on December 10, 2023.36. Plaintiff underwent the revision surgery on December 7, 2023. Her recovery was severe: on pain medications for severe pain, she was unable to speak for several days due to intubation complications and surgical swelling, and required steroid injections to alleviate the inflammation; due to strain, her stitches later came through her skin and a large hematoma formed. As a precaution, Plaintiff's out-of-office message indicated a potential medical absence through January 5, 2024; in fact, she resumed reviewing work email on December 12, 2023, and was away from her computer for a total of only eight days — using her vacation and sick days for the absence — with Dana Timchenko, a portfolio manager, covering her book, and her Client Service Associate

("CSA") Jill Hughes informed of the surgery. Plaintiff took no short-term disability leave for this absence.

37. When Plaintiff opened her email on December 12, 2023, she found multiple emails from Pawlowski demanding a call with her — which she could not do, as her throat was still significantly swollen, so she emailed a response instead. Pawlowski ordered Plaintiff to tell him where she "had [her] surgery approved in the system." No such "system" exists — as was later confirmed — and Plaintiff informed him that she had followed precisely the same notification protocol as for her prior surgeries. Pawlowski denied ever receiving any notification from Plaintiff about the surgery — despite Mason having responded on December 6 to the very email on which Pawlowski was copied. Pawlowski and Mason told Plaintiff that "if Hassan hadn't left, it wouldn't have been a problem" — an open admission that management's hostility toward Plaintiff's medical absence was driven by staffing and production pressures, not by any legitimate policy.

38. On December 27, 2023, Pawlowski emailed Plaintiff again demanding to know where she "had [her] surgery approved in the system," insisting that Plaintiff had not informed anyone of her leave and asserting that he "could not find a management team member, nor Jill or Dana, that was aware of your taking a month's medical leave." Those assertions were false in every material respect: Plaintiff had been away from her computer for eight days, not a month; she had taken no disability leave, using only vacation and sick days; Dana Timchenko was covering her book; Ms. Hughes had been informed; and Plaintiff had emailed Pawlowski and Mason directly on December 6, 2023 — an email Mason answered in writing with Pawlowski copied. Despite being shown that written evidence repeatedly, Pawlowski and Mason continued to insist — with the response sitting date-stamped in the record — that Plaintiff had imagined the email. They likewise claimed not to believe the December 6 email to Human Resources, in response to which

HR had instructed Plaintiff to submit the accommodations form she in fact submitted on December 10.

39. On December 20, 2023 — while Plaintiff was recovering from the December 7 revision surgery — the Firm's AWL system refused Plaintiff's pending work-from-home accommodation request "due to an ongoing conversation," even though all required documents had been provided. There was no such conversation; Plaintiff was never given notice of the denial or its basis; and she placed a note in the Firm's workflow system asking what was required to begin the process again. Defendant's own records confirm this sequence: on January 14, 2024, Plaintiff emailed Human Resources Director Allbrook, attaching an updated work-from-home request supported by a form signed and transmitted by her surgeon's office (Cuellar Spine) on January 12, 2024, explaining her physician's recommendation that she work from home "this year" with seating supporting her healing neck and breaks to lie down, renewing the standing-desk request (and offering to pay for the desk herself), and expressly flagging that her AWL request had been "refused in the system December 20th after all documents were provided," on the stated ground of an "ongoing conversation." Any contention that Plaintiff's accommodation paperwork lacked physician support is refuted by Defendant's own exhibit.

40. On January 29, 2024, Plaintiff attended an accommodations meeting with Human Resources Director Tiffany Allbrook, Branch Manager Pawlowski, and Complex Risk Officer John Poor, at which she once again requested her accommodations — including the standing desk and the medical work-from-home request submitted December 10, 2023 and renewed January 14, 2024. It was at least the third discussion in the accommodations "process," and once again, nothing changed: no accommodation was approved or provided. All advisors, operations staff, and support staff in the complex had been given standing desks — free of charge and without any

accommodation request — while Plaintiff, the only employee in the complex with a surgeon-supported request, went without one. Plaintiff was later told by Human Resources representative Jeanne Cho that her accommodations were not approved because she had not "submitted a case." That was blatantly incorrect: Plaintiff had taken part in the appropriate accommodations process multiple times over years, submitted every required form (with surgeon's support on file since December 2022 and a physician-signed form submitted January 2024), and simply been made to come back, over and over, to re-request accommodations that never came.

***D. The Hostile Environment: Targeting, Surveillance, Interrogation, and the Disclosure of Plaintiff's Legally Protected Confidential Address***

41. The management conduct Plaintiff experienced was part of a broader, established pattern at the branch and complex in which Human Resources protected management and favored producers while punishing the employees who complained. In Spring 2019, Plaintiff personally witnessed, from the other side of an office wall, Branch Manager trainee Ebony Moore and Vicki Strine terminate a fellow female advisor ("Susan") — Plaintiff saw Moore physically in Susan's face and heard Moore and Strine threatening her. Two weeks earlier, Susan had gone to Human Resources because another Financial Advisor was physically threatening her and publicly berating her — an advisor who, upon information and belief, had been sent to HR numerous times. The accused advisor lied to HR; Susan — a former FA and high-ranking executive at Bank of America and Wells Fargo — was fired for something she did not do; and when Susan refused to sign an NDA without attorney review, Moore screamed at her and verbally and physically threatened her. Plaintiff reported what she witnessed to HR.

42. The same violent advisor physically threatened Plaintiff's CSA, Jill Hughes, on an ongoing basis through April 2024. The CSA went to complex management, and the office

communicated the same concern; complex management did nothing to stop the daily abuse or the physical threats — instead telling Ms. Hughes she was "stuck" working with the advisor. Ms. Hughes transferred to the Winston-Salem branch in April 2024. Upon information and belief, that advisor — a ~~male~~ Financial Advisor with production equal to or less than Plaintiff's — was given a CSA immediately, while Plaintiff, as alleged below, was left with none.

43. Robert Pawlowski targeted Plaintiff from nearly the moment he arrived. In 2022, within weeks of arriving at the branch, Pawlowski called Plaintiff's personal phone number — a number she kept private for safety reasons — and told her she "had to transfer to Raleigh" because she "was outside his territory." Plaintiff explained that she maintained a confidential address and could not give out her address; ~~she told~~ Pawlowski stated that if she would not give up on the issue, she would have to go to work in Raleigh. She explained her address situation and asked him not to write it down or send it in any messages, to keep from losing her job. After her surgery she could not drive to Raleigh; she raised the issue with her complex risk officer and was told it would not happen again.

44. In August 2022, Pawlowski ordered Plaintiff to physically come into his office and announce herself to him every time she came into the branch — a demeaning surveillance requirement he justified with the assertion (relayed through Ms. Timchenko) that Plaintiff had not logged into her computer for an entire year. That assertion was self-evidently false — Plaintiff made Pacesetter's Club in 2019, 2020, and 2021 — and when Plaintiff explained she had been in the office the day before, meeting with a client in a conference room reserved through the master calendar, Pawlowski admitted he was not even aware there was a master calendar, asking "how do I get onto that?" Plaintiff complied with the check-in requirement in a professional and cordial manner, as she did throughout her dealings with management.

45. From December 2022 through July 2023, Morgan Stanley subjected Plaintiff to an invasive "phone investigation." On December 1, 2022, Jon Tortora of Morgan Stanley's Special Investigations Unit emailed Plaintiff that "the Firm has been made aware that you have business-related communications on your personal device" — communications identified not through any review of Plaintiff's conduct, but during the Firm's review of her partner Dana Timchenko's communications — and stated the Firm was "providing her with an attorney" (Sean Haran of Walden, Macht and Haran LLP). Plaintiff contacted the designated attorney as instructed and did not hear back; on a second attempt Mr. Haran, reached on a train, said he could not talk and that a colleague would text her — no one ever texted or called back. Plaintiff's phone SIM card was disabled without any warning, leaving her working from home without a phone for a week (captured in email); her corporate phone was often disabled; and the Firm confirmed in email that her SIM was placed in a batch to remotely wipe and disable the phone. In March 2023, Compliance's John Perry dictated the contents of an email for Plaintiff to send to close the phone issue — which she wrote and sent as dictated — while her requests to actually review the text messages at issue were refused, then and ever since. In July 2023, Complex Manager Mason verified in person that the phone issue was closed, that Plaintiff was not being fined, and that nothing more was to be done.

46. Yet on June 4, 2024 — nearly a year after Mason confirmed closure — Pawlowski emailed Plaintiff that a requested HR meeting (from Caresse Blevins, sent without any context) was "in regards" to the phone investigation "still outstanding." A matter the Firm had confirmed closed, without fine or further action, was resurrected as pretext and leverage precisely when Plaintiff's discrimination complaints were pending — emblematic of the Firm's practice of keeping a file open on the complainant rather than the misconduct.

47. Plaintiff is a survivor of domestic violence. She holds a domestic violence protective order under N.C. Gen. Stat. Chapter 50B arising from proceedings — sealed because they involved her minor children — against her former husband, and she is enrolled in the North Carolina Address Confidentiality Program ("ACP") administered by the North Carolina Department of Justice, N.C. Gen. Stat. Chapter 15C. Under the ACP, a participant's actual home address is confidential, and the participant is entitled to use a substitute address designated by the Attorney General. Plaintiff's ACP participation and confidential address arrangement were disclosed to Morgan Stanley in 2016, had been accommodated in the industry since 2010, and had never been a problem.

48. On October 6, 2023, Plaintiff complained in writing to Human Resources' Raquel Rosales-Vinalay, copying Morgan Stanley HR Mid-Atlantic, regarding her ACP participant status. Plaintiff informed HR in writing that Morgan Stanley is not allowed to give out her address at any time while she is an ACP participant. She asked why Ms. Rosales-Vinalay was seeking information regarding her Chapter 50B protective order, and why — after she had worked for Morgan Stanley since 2016 — it was suddenly a concern. She explained that she was being made uncomfortable by the questions posed and the manner in which they were presented: demands that she provide "proof" of having a protective order; requests for details regarding the order for the purpose of giving out her address; and the absence of any concern for her safety and wellbeing. She wrote that she did not want to relive what had happened to her; that the inquiry was upsetting and distracting to her work; that she had been given no chance to prepare for the call that occurred the day before; and that when she asked why, Ms. Rosales-Vinalay simply began asking her to "prove" what had happened and why she could not provide her address. Plaintiff explained that she had spent years in court proving why her address should not be known, and that her employer

should not require her to relive that traumatic experience in the middle of her workday, without notice. This October 6, 2023 written complaint refutes any suggestion that Plaintiff had ceased to regard the confidentiality of her address as a safety concern.

49. In the same October 6, 2023 written complaint, Plaintiff objected to Ms. Rosales-Vinalay's stated intention to place documentation in Plaintiff's HR file regarding her protective order that would identify Plaintiff and her family as victims. Plaintiff asked to make sure she was not identified in that manner to anyone in the Firm — it had not been necessary in the preceding eight years, it was intrusive, and it would not allow her to function as an inclusive member of the Firm — and she asked that, if she had been so identified, Morgan Stanley identify the Firm policy stating that all victims of domestic violence must be permanently identified by HR in their personnel files, together with the date on which the Firm could give their addresses out to the general public.

50. On or about October 16, 2023, Plaintiff made another request for her accommodations — the standing desk and the ability to work from home — per the instructions given to her by Complex Risk Officer John Poor. This time, Human Resources told Plaintiff that, to accommodate her work-from-home location, the Firm needed to reveal her home address to FINRA — an assertion that was false, and one Plaintiff had never before been required to satisfy because of her participation in the ACP. Morgan Stanley HR and Legal emailed and called Plaintiff demanding proof and "findings of fact" from her Chapter 50B hearing — a sealed proceeding involving her minor children — midday, at work, without notice. Plaintiff informed them she was not comfortable disclosing the details of that ordeal and instead provided her ACP program card issued through the North Carolina Department of Justice. Morgan Stanley responded that the card was "up for renewal in November," so to come back and go through the process again. The work-

from-home request was then refused in the AWL system on December 20, 2023, on the stated ground of an "ongoing conversation" — documentation Plaintiff saved, and which Defendant's own EEOC exhibits corroborate; there was no such conversation, Plaintiff was never informed of the denial, and she was left concerned she was being fired. Upon information and belief, Defendant obstructed her request because of her protective order and ACP enrollment, while Financial Advisors with ordinary addresses — including male Financial Advisors — were routinely granted work-from-home arrangements approved by several regional managers.

51. Ten days after Plaintiff's written objection — having been told in writing that the law forbade it — on October 16, 2023, Morgan Stanley disclosed Plaintiff's actual home address, the address protected by her ACP enrollment, together with her personal phone number, in an email transmitted to multiple Morgan Stanley employees and placed with FINRA and the Firm, putting Plaintiff's safety and her children's safety at risk from their abuser. Plaintiff requested to have the email recalled but was met with silence. Plaintiff does not believe Morgan Stanley would have handled her protective order, her ACP enrollment, and her address with such disregard but for her sex. Morgan Stanley likewise made Plaintiff's personal phone number available after she had asked for it to be kept private — which is how Pawlowski had obtained it, and he called it even after being told to stop. Any assurance by Complex Risk Officer Poor months earlier that "the Firm would work with FINRA to shield her home address" only underscores that the Firm knew the address required protection — and disclosed it anyway.

52. When Employee Relations' Jeanne Cho finally delivered the results of her "investigation" on June 6, 2024, she asserted that the investigation had revealed "several erroneous items" — including the remarkable position that FINRA requires Plaintiff's address and "overrides" the North Carolina Attorney General's confidential address program. Plaintiff's

confidential address was disclosed a second time in Defendant's own exhibits, after Plaintiff's resignations from the firm; an address that had not been shared at any time with the firm, and now disclosed to the general public.

***E. "Do You Really Think She Can Handle It?" — Management Raids Plaintiff's Book of Business for Jeremy McPherson While She Recovers From Surgery***

53. On December 8, 2023 — the day following Plaintiff's surgery — Financial Advisor Hassan Kaouss left Morgan Stanley for Raymond James. Per firm policy, Kaouss's accounts were required to be evenly distributed among the advisors in the branch; however, most advisors refused to call his clients due to the reason for his departure. Before leaving, Kaouss stopped in to say goodbye to the advisors and said he was leaving because Morgan Stanley would not pay him money he was owed, and that he had limited CSA help despite repeated calls to HR about the pay discrepancy; within a week, all of his clients had followed him to Raymond James. Plaintiff — in surgical recovery and away from the office — was solely blamed for the loss of Kaouss's clients: Mason and Pawlowski publicly stated that Plaintiff's surgery caused her and the Firm to lose the cases, using her as a scapegoat because of her disability. That the Firm would later deny these statements to the EEOC while asserting that Kaouss "resigned prior to Ms. Hobson's surgery" only confirms the point: Kaouss resigned on December 8, 2023 — the day after Plaintiff's December 7 surgery.

54. On December 20, 2023, Dana Timchenko announced that she would be leaving the Firm effective February 1, 2024, and stated that she was in the process of transitioning her clients to Plaintiff. Mason responded: "Do you really think she can handle it? Don't hand your clients off to Elizabeth" — citing Plaintiff's surgery as the reason Plaintiff could not handle her job. The next day, when Ms. Timchenko told Pawlowski of her plan to transition her clients to Plaintiff,

Pawlowski responded with the same sentiment — "Do you really think she can handle it?" — referred to Plaintiff as "a girl," and used other infantilizing and demeaning language about Plaintiff, again invoking her surgery, all heard by the office as Ms. Timchenko recited Plaintiff's performance and the Firm's own requirements.

55. The following day, on or about December 22, 2023, Mason approached a male Financial Advisor on the team who was rumored to be leaving the Firm, provided that male Financial Advisor a full list of Ms. Timchenko's clients, and offered to give the clients to the male Financial Advisor if he stayed with the Firm, telling him that Plaintiff "would not be at Morgan Stanley much longer" and "couldn't handle her job." The male Financial Advisor refused, recognizing that doing so was a clear violation of applicable policies, ethics, and agreements.

56. In late December 2023 or early January 2024, Mason also contacted Human Resources himself and asked whether he could take over Plaintiff's clients — and was told no, which he has publicly admitted. At a mandatory business planning meeting Mason called on January 19, 2024 — in front of at least two other members of management on the calendar invitation — Mason admitted it out loud: "I called HR and asked if I could take the book, and they stated even if Dana was hit by a bus, those are your clients." As Mason put it on another occasion: "even if Dana is hit by a bus, they are my clients." He took the clients anyway. That admission is devastating in two directions at once: it establishes that Mason set out to strip a top advisor's book while she recovered from spinal surgery — and that he did so after Human Resources told him the clients were hers. His conduct further demonstrated his belief that Plaintiff could not perform her job due to her disability and gender, despite her year-over-year outperformance of her job responsibilities.

57. At the January 19, 2024 meeting — for which Mason required Plaintiff to appear in person at the Cornelius office, refusing her request to attend by Zoom weeks after spinal surgery — nothing was discussed regarding the business plan Plaintiff had prepared. Instead: (a) Mason asked Plaintiff to review an Excel spreadsheet of PwC versus non-PwC clients Ms. Timchenko had been required to prepare, on the stated premise that "some of the names were duplicates"; Plaintiff reviewed it and responded that there were no duplicate names, only "a few accounts that are the same name, but listed correctly"; (b) Mason handed Plaintiff her own metrics showing she was at the top of the complex for net new assets, client retention, contacting clients, and revenue growth; and (c) Mason told Plaintiff he wanted to "hand" her Kaouss's book of business, saying Kaouss was "out there chasing waterfalls" — although Kaouss had already moved most of his clients. Plaintiff has a screenshot of the meeting.

58. Mason's proposal was itself a violation of firm policy: a Complex Manager is not permitted under any circumstances to "hand" anyone a book of business; departing-advisor accounts were required to be distributed through the Firm's established processes, including the Account Retention Tool ("ART"), a system Morgan Stanley put in place years earlier after a record-setting class action. Upon information and belief, Plaintiff was set up as the scapegoat for Kaouss's successful transition of his clients — because she had been out for surgery and unavailable to be pressured into calling his clients, while the other advisors in the office refused to call them — and Mason, rather than following firm guidelines, moved Kaouss's remaining clients to the Charlotte branch, whose management numbers Mason reports along with the complex numbers, thereby falsely boosting his own reported figures. Upon information and belief, Mason planned to "hand" Plaintiff Kaouss's departing book (which would leave with Kaouss) while taking from Plaintiff the cases in her JPN with Ms. Timchenko — a swap of real revenue for vapor.

59. Defendant has suggested — including in its EEOC position statement — that Plaintiff and Ms. Timchenko "agreed" to the disposition of the JPN accounts, pointing to a January 22, 2024 email exchange in which Complex Risk Officer Vigliotti told Plaintiff that, "[e]xcept for the accounts highlighted in green that will be moved to the McPherson Group in the Charlotte office, we intend to transfer the accounts to you," and in which Plaintiff confirmed that she and Ms. Timchenko had "reviewed the Excel sheet per request" and that "the highlighted items are correct." That exchange establishes the opposite of consent. First, it is a written admission by the Firm's own Senior Risk Officer that the Firm — not Ms. Timchenko — designated accounts from Plaintiff's JPN "to be moved to the McPherson Group," the team of the very advisor Mason had hired with knowledge of his harassment history. Second, Plaintiff's confirmation, made "per request" of management, addressed the accuracy of the list — including whether "a few accounts that are the same name" were duplicates — not the propriety of a transfer she had no authority to countermand and which management had already directed after HR told Mason the accounts were Plaintiff's. Third, the designations were made and communicated in the shadow of Mason's December statements that Plaintiff "couldn't handle" the book, and weeks before Mason threatened to fabricate a customer complaint against Plaintiff when she objected. Fourth, on February 7, 2024 — after Ms. Timchenko's departure — Vigliotti himself emailed Plaintiff, in all capital letters, "DO NOT WORK OFF THE SPREADSHEET," confirming in writing that the spreadsheet was not a settled allocation of clients to Plaintiff. Yet in a recorded mandatory meeting, Mason claimed he had "in triplicate" sent Plaintiff a list of clients she would receive. Vigliotti's February 7 email confirms Mason's statement was false. At no time did Plaintiff agree to give away approximately $200,000 in revenue, and at no time was she given a list of clients she would receive.

60. To the extent Defendant contends that accounts were removed from Plaintiff because certain clients were employed or formerly employed by PricewaterhouseCoopers ("PwC") and subject to compliance restrictions, Defendant has never identified to Plaintiff any license, registration, designation, or written policy that disqualified Plaintiff from continuing to service accounts she had lawfully and openly serviced for years within the JPN, under Defendant's direct supervision and oversight. Either no such disqualification existed — in which case the "PwC" rationale was pretext for moving Plaintiff's accounts to a male advisor — or it did exist, in which case Defendant knowingly permitted Plaintiff to service those accounts for years and invoked the restriction only when it became a convenient vehicle for stripping her book while she recovered from surgery.

61. On January 26, 2024, while Plaintiff was at the Cornelius office to review portfolios with Ms. Timchenko, Pawlowski summoned Plaintiff into his office — without notice, alone — and asked if his email had "offended" her. What followed was an interrogation that no employee should ever endure. Pawlowski asked invasive questions about Plaintiff's injuries and surgeries and began peering at her neck. He questioned Plaintiff about her surgery, volunteered that his wife had had surgery and "couldn't return to work for months," and told Plaintiff "I can't believe you are here" — never once offering assistance. He stared at her neck and challenged her: "I thought you had surgery on the front of your neck," telling her he had heard her injuries were from a car accident, and asked to see her incisions. When Plaintiff explained she had incisions on both the front and the back — and offered that she had pictures and the surgical report — Pawlowski persisted until, feeling pressured and uneasy, Plaintiff lifted her hair and removed her coat to physically display her surgical incision to her Branch Manager, who got up from behind his desk

and began looking down her coat while she was still standing. He still continued questioning her about her surgery.

62. Pawlowski then pressed to know what had happened to Plaintiff's neck and how the injury occurred. Plaintiff brushed the question aside several times and said she needed to leave. Pawlowski pressed: "I heard it was a car accident." Feeling pressured and uneasy, Plaintiff eventually revealed that the injury was inflicted by her former husband — who was suffering from mental illness — which is why she was in the ACP program. Pawlowski responded: "If someone did that to my daughter I would kill them!" — and then asked whether Plaintiff's father "was still around," and why her father had not killed her former husband. Plaintiff's father was suffering from Alzheimer's disease at the time. When Plaintiff again said she needed to get to another meeting, Pawlowski began discussing a recent death in his own family; Plaintiff expressed condolences, pretended Ms. Timchenko was calling her, and escaped. This was not an appropriate conversation for a supervisor to initiate — especially given Pawlowski's pressure on Plaintiff to show him her scars. No manager in Plaintiff's career had ever pressured her to display her surgical incisions, interrogated her about her domestic violence history, or mused about who should have killed whom. That Pawlowski had exchanged cordial pleasantries with Plaintiff by email earlier that month is no answer: Plaintiff maintained a professional, courteous demeanor with her managers throughout — as her contemporaneous emails reflect — precisely because she feared retaliation, a fear she later memorialized in writing to the Firm's own hotline.

63. Pawlowski then manufactured a false record of an encounter with Plaintiff. In the transcript of a mandatory meeting later called by Mason and Pawlowski, Pawlowski claimed he had had a planned meeting with Plaintiff at which she walked into his office, told him "I don't need to tell you where I am," did an about-face, and left the building. No such meeting occurred:

Plaintiff's calendar screenshot for February 26 shows her meeting that day was with Ms. Timchenko, and there was no meeting with Pawlowski.

64. Ms. Timchenko left the Firm effective February 1, 2024. Mason then used Ms. Timchenko's non-PwC clients as a free "retention tool" to increase his own revenue, taking accounts out of Plaintiff's JPN in violation of firm policy and directing them to Jeremy McPherson, the advisor Mason had hired in May 2023 with full institutional knowledge of his history.

***F. February 2024: The Raid Executes — Threats, Falsified Records, and Tens of Millions in Client Assets Stripped From Plaintiff's Book***

65. Starting in February 2024, Mason gave Ms. Timchenko's client list to Jeremy McPherson — a male advisor on a team — and gave McPherson permission to begin soliciting the clients Plaintiff had acquired from Ms. Timchenko. Plaintiff had been legally and financially responsible for these clients and accounts for years. Plaintiff held all required State securities licenses and insurance licenses with appointments to all carriers and alternative investments to ensure clients would not experience interruption in service.

66. On February 2, 2024, Plaintiff submitted a disability and gender discrimination complaint to Human Resources by telephone. Defendant's own "Hot Topic" intake record, generated on or about February 6, 2024, memorializes Plaintiff's complaint in the Firm's own words: that her "manager took most of her book of business due to her having surgery"; that "[h]e gave the business to others even though FA comp and HR told the manager not to"; that Plaintiff "has asked him to stop" and "he is retaliating"; that she "was told she was not allowed to go on leave or to have surgery with[out] his permission"; that "[a]fter her surgery she returned back to work and the manager ~~pulled her partner and~~ took her cases after he was advised not to"; that "[h]e is continuing to take her cases"; that Plaintiff "feels that she cannot even go on leave anymore or

would come back to no book"; and that Plaintiff "would prefer that HR reach out to her first, as she does not want more retaliation."

67. On February 5, 2024, Plaintiff emailed Mason, Pawlowski, and Complex Risk Officer Anthony Vigliotti asking why cases were being removed from her book and requesting clarification. She received no response. Her CSA, Jill Hughes, also emailed asking for a response by end of day; Ms. Hughes was ignored — and instead told she needed to apologize to Ebony Moore for the tone of her email. Plaintiff and Ms. Hughes were working 12-to-14-hour days and could not answer clients' questions about why they were being moved to McPherson — an advisor the clients did not know, and whose prior firm the clients had already left.

68. The same day, February 5, 2024, after the complex asked Plaintiff to place a trade for a client to raise cash — a trade the client confirmed in a written confirmation form, that Plaintiff was the only advisor able to place, and without which the client's account would have overdrafted — Mason called Plaintiff and claimed the client was "one of Jeremy's new clients." When Plaintiff asked for her clients to be returned and for McPherson to stop soliciting her clients, Mason threatened to falsify a client's FINRA complaint against her. Plaintiff has the email, the record of the incoming call from Mason, multiple emails she sent to Mason showing she was asked by the complex to place the trade, and the client's confirmation form. There was no client complaint. Plaintiff contemporaneously reported the threat to Employee Relations in writing on February 20, 2024, telling Ms. Cho that she had asked management to stop taking her clients and, in response, had been threatened with a fabricated complaint if she said anything more.

69. Also on February 5, 2024, Plaintiff called to introduce herself to a client and was told that McPherson had just called the client claiming he was her new advisor and that Ms. Timchenko "wanted her clients to go to him" — which was false. Plaintiff received the client's email,

forwarded it to her complex risk officer, and respectfully asked that McPherson stop soliciting her clients, which was against firm policy. She was met with threats from Mason. Plaintiff never stated or implied to management that McPherson was lying to them.

70. Over the following month, tens of millions of dollars in client assets — approximately $40 million from her JPN with Ms. Timchenko alone — were taken off Plaintiff's book of business without notice — after she had met with those clients and initiated portfolio changes, rollovers, and insurance planning — and several of the resulting transactions were credited to McPherson and his team. Upon information and belief, the removals extended beyond any accounts designated on the January spreadsheet, including non-PwC clients. The raid continued until Plaintiff went out on disability leave. Throughout, Plaintiff — still without the standing desk her surgeon had supported more than a year earlier — worked 12-to-14-hour days standing at her kitchen counter, severely straining and re-injuring the muscles in her surgically repaired neck, which could not heal. Upon information and belief, the account movements are documented and recorded by the ART tool and Defendant's required policies and procedures, including records confirming that JPNs were overridden and terminated by the Branch and Complex management team in violation of the Firm's ART tool, for the purpose of giving these clients to McPherson, who had no right to any account.

71. The clients did not want to be moved. On February 13, 2024, one $5 million household Plaintiff had met with three weeks earlier was returned to her — after the client called and said she did not understand why she had been moved and did not want to be moved — but not before a $600,000 rollover was credited to McPherson's team, at Mason's encouragement to McPherson to take whatever he felt entitled to. The move held up the client's insurance ticket for months, requiring resubmission through underwriting. The clients remained with Plaintiff and

were happy with her planning and performance through her resignation. Following her resignation, Plaintiff has honored her post-employment obligations to Defendant and has not solicited these clients.

***G. Plaintiff Reports the Misconduct — and Human Resources Investigates Her Instead***

72. On February 12, 2024, Plaintiff contacted Human Resources to have Mason and McPherson stop taking clients from her book of business, contacting the Firm's Alternative Resolutions team for help. Raquelle Dickson responded by email that Plaintiff's concerns had been "escalated" to Jeanne Cho in Employee Relations. The Alternative Resolutions team never communicated with Plaintiff again. Instead of receiving help, Plaintiff was told she would have to go through an investigation with Ms. Cho — the complainant, not the misconduct, became the subject — and no further assistance was provided.

73. Over the following days, Plaintiff sent Ms. Cho a series of detailed, specific, contemporaneous written complaints documenting the discrimination, harassment, retaliation, and denial of accommodations, each of which is summarized below. These writings — together with the additional emails and recorded communications in Plaintiff's possession — capture, in real time and in Plaintiff's own words, the events that led to her constructive discharge.

74. On February 15, 2024, Plaintiff reported to Ms. Cho in writing that McPherson was actively soliciting her JPN clients — and that the complex risk officer had confirmed that McPherson spoke to her client on the phone. Plaintiff informed Ms. Cho that McPherson was the very advisor Mason had said should receive all of the accounts in Plaintiff's JPN, without her permission; that McPherson had been teamed with Ms. Timchenko at UBS; and that Ms. Timchenko had not spoken to McPherson regarding the transition because she feared for her safety. Plaintiff further reported that neither she nor her CSA had received any communication about

which accounts would be in her number after February 1; that her emails and calls went unanswered; that she had no means of providing guidance to clients because she did not know who was moving or staying; that the risk officer's own email instructed her not to work from the Excel spreadsheet Ms. Timchenko had been required to make; and that after Ms. Timchenko's departure that instruction was treated as a mere suggestion, as the complex officer began moving additional clients — clients who were not PwC — to another branch.

75. On February 16, 2024, Plaintiff reported to Ms. Cho, in writing, a specific example of the ongoing raid: the accounts of clients K.S. and C.R. — accounts established under Plaintiff's number, belonging to clients with whom she had met and reviewed planning, who were in the midst of rollovers with their next meeting already scheduled for April — were being moved immediately, without notice to her, simply because the other advisor stated he wanted the accounts. The accounts were not part of a household, and the client had told Ms. Timchenko before her departure that they did not want to work with that advisor: the client had worked with him at UBS and had left him to work with Ms. Timchenko. Plaintiff wrote that it was upsetting to see this continue each day without reason; that she had worked diligently to continue the relationship; and that the account had been in her JPN for several years.

76. Critically, Plaintiff told Ms. Cho in the same February 16, 2024 email that this conduct was the primary reason she was concerned about taking disability leave — because the complex manager would continue to take and give away her book of business without her knowledge and approval while she was out. Eleven days later, Plaintiff's physicians ordered precisely the leave she had told Morgan Stanley's Employee Relations department, in writing, she was afraid to take. Her fear proved well-founded.

77. On February 20, 2024, Plaintiff sent Ms. Cho a detailed written rebuttal of the "narrative" management had supplied to Employee Relations. Plaintiff informed Ms. Cho that: (a) Ms. Timchenko did not give away the clients in their JPN; (b) written communications had alerted Morgan Stanley that Ms. Timchenko's clients did not want to work with McPherson; (c) Ms. Timchenko had disclosed to Morgan Stanley that she was worried about her safety; and (d) Morgan Stanley management was making ongoing demands to send all PwC clients to a particular group not located in Plaintiff's branch. Plaintiff told Ms. Cho that the Firm's narrative — that Ms. Timchenko had simply decided to give away $40 million of assets to one advisor, and that Plaintiff herself "didn't say anything" — was inaccurate: Plaintiff did ask management to stop, and in response she was threatened with a fabricated complaint if she said anything more.

78. Plaintiff further informed Ms. Cho that the emails Ms. Cho was referencing were from Mason himself — the same Mason who had said, to Plaintiff and others in a meeting, that he had called HR and FA Compensation himself and was told that "even if Dana was hit by a bus" the accounts were to stay in Plaintiff's number; that those emails followed a conversation with Ms. Timchenko in which Mason stated that Ms. Timchenko was not to "hand off" the accounts in her JPN with Plaintiff to Plaintiff; that "Do you really think she can handle it" was the reason Mason gave for his decision to take the accounts; and that Ms. Timchenko had objected — which is what prompted Mason to call HR and FA Compensation himself.

79. Plaintiff also explained to Ms. Cho why she had not argued at the meeting held a few days after her surgery: her absence of argument was an effort to keep her health insurance in place. In addition to her medical history, Plaintiff has one son with Autism/special needs and another son who was being treated for cancer in March 2024. She also felt compelled to remain silent to avoid further public degradation and humiliation by Defendant's Branch and Complex management

team, including but not limited to Mason and Pawlowski. She confirmed that the statement that she was "aware" management was taking clients from her practice against firm policy was correct — she was made aware of the decision to start taking her clients out of her FA number and was not given a choice about it. She observed that management seemed confused in understanding that their decision was against firm policy, and that they continued to "blame" their own decision on her — a practice she called, in her words, "ridiculous."

80. In a second February 20, 2024 email, Plaintiff dismantled management's claim that her review of an Excel spreadsheet constituted her approval and consent to take $40 million from her JPN. She explained that Mason had asked her to review a spreadsheet — already alphabetized — solely to see whether there were duplicated names, and nothing more; that Ms. Cho could review the timeline of Mason's phone call to FA Compensation, his meeting with Ms. Timchenko, and the spreadsheet's creation at Mason's own request; that Mason had required Ms. Timchenko to write her own transition letters and send them out even though Mason knew or should have known that no advisor can actually write a transition letter, as those records are computer generated after an advisor leaves; that Plaintiff advocated for herself, as did Ms. Timchenko; and that Mason continued to take additional cases after Plaintiff told him to stop. Plaintiff closed by telling Employee Relations that what Ms. Cho had presented did not constitute her consent, that she would not correspond further because it would only make matters worse, and that she wanted to be moved as soon as possible.

81. Also on February 20, 2024, Plaintiff raised with Ms. Cho a compensation matter on which she had been seeking assistance from Pawlowski since December 2023 without resolution: a large commission Plaintiff earned in December 2023 — on an insurance policy paid for on November 30, 2023 — was not credited until late January 2024, causing her payout grid rate to

fall from 36% to 28% and costing her approximately $3,000 in commission. She asked for assistance in having the case credited on time and for a grid-rate exception for January 2024. Instead of resolving it, Pawlowski and others asked Plaintiff for the same information multiple times, told her to call FA Compensation, and claimed they needed the information "to make a decision" — which was not correct, because the decision belonged to the complex manager and Plaintiff had already provided the information. Each person told her something different. When Plaintiff, after all of this, asked Pawlowski directly what he needed, he said he did not know what was needed. As Plaintiff explained to Ms. Cho, she was working twelve-hour days following spinal surgery, being asked to set meetings with no course of action — being run down until she would agree the discussion was closed and stop asking for the grid-rate lock. The process was designed to wear her out.

82. These contemporaneous, detailed, documented complaints were met with silence. February 20, 2024 was Ms. Cho's last point of contact; thereafter Ms. Cho would not respond to Plaintiff's emails, resurfacing only months later — and then only to "close out" the matter with findings against the complainant. Plaintiff's complaints to Human Resources resulted in an investigation with Ms. Cho that once again resulted in no remedy.

83. Upon information and belief, in March 2024, Ms. Cho and a colleague named Jennifer called Ms. Timchenko, who expressed her concerns; when Ms. Cho asked Ms. Timchenko for written documentation of McPherson's ~~sexual~~ harassment, Ms. Timchenko declined — sharing that she was in fear for her personal safety. Morgan Stanley thus received, again, direct notice that a second woman feared the advisor to whom Mason was directing Plaintiff's clients — and did nothing.

84. Morgan Stanley also failed to provide Plaintiff support that other Financial Advisors received, and misrepresented the nature of her absence to her clients. Plaintiff's phone line often went unanswered while she was in meetings, leaving her clients without anyone but Plaintiff herself to provide all services. In April 2024, Plaintiff emailed Ms. Cho to inform her that Plaintiff no longer had a CSA even though, upon information and belief, similarly situated male Financial Advisors in the branch and complex — including advisors with production equal to or less than Plaintiff's — had dedicated or functioning shared CSA coverage. The loss of coverage forced Plaintiff to spend an inordinate amount of time processing administrative tasks, hampering her ability to take on new clients; Plaintiff was effectively paying the Firm for administrative support that she was not receiving. There was no response for months. To the extent Defendant contends that its support-staffing metrics turned on revenue thresholds, upon information and belief those metrics were not applied evenhandedly: ~~male~~ advisors below any claimed threshold received functioning support, while Plaintiff — whose CSA departed in April 2024 after complex management ignored her reports of being physically threatened by a male advisor — was left without functioning coverage for extended periods, was told in 2025 that no replacement would be assigned to her, was asked March 17, 2025 to pay $1,000 per month for basic operations support, was left to operate her business from a broken Chrome book outside of the office with no capability to print, scan or fax; which the firm decommissioned years earlier and refused to repair or replace, and watched a male advisor with production equal to or less than hers receive a CSA immediately.

85. Also in April 2024, Plaintiff received notice that a client was again taken from her and given to a male advisor for no reason: after Savannah Branch Manager Jose Ruiz left Morgan Stanley for Rockefeller, the complex dissolved Plaintiff's JPN with Ruiz — against firm policy —

and Plaintiff's Special Needs Planning client was taken out of her book and given to a male advisor in Savannah. The client — who had been in Plaintiff's JPN with Ruiz for several years and with whom she met often — called Plaintiff, confused, and asked to be placed back under her supervision, as Plaintiff specialized in the area. Plaintiff asked for the client back and was told the client would be returned only if the client asked. Plaintiff had written the Firm's own special needs planning seminar and marketing documents (with Alison Conte in marketing) and was absolutely qualified for the case; the male advisor who received it had no experience in special needs planning. The complex did not return the client until the client wrote in asking to be moved back — after months of revenue flowed to an unqualified male advisor. This caused unnecessary angst to Plaintiff's clients and to Plaintiff, and Plaintiff believes it was, in part, retaliation for her February complaint.

86. In May 2024, Plaintiff was subjected to a call with Mason, Pawlowski, Moore, and Vigliotti in which it was claimed that Plaintiff had neglected clients — and Plaintiff was told that a client had reached out to McPherson on LinkedIn. The Firm's own raid had, by design, manufactured the very client-service disruption now being blamed on Plaintiff: her out-of-office had not been maintained during her medical leave, her clients' calls went to an unanswered line, her CSA was gone, and her accounts had been scattered — and management then convened four-on-one calls to accuse her of neglect, despite over 60 system documented points of contact with the client, including an asset verification letter signed by management a week prior.

87. The pattern that emerges from Plaintiff's documented interactions with Morgan Stanley's Human Resources, Employee Relations, and compliance apparatus is unmistakable. Every channel that appeared to exist for Plaintiff's protection functioned instead as a mechanism of delay, information-gathering, and reprisal: (a) accommodation requests supported by her

surgeons disappeared into a "process" that required endless re-submission and produced nothing — and were then blamed on Plaintiff for never having "submitted a case"; (b) complaints of discrimination were "escalated" into an investigation of Plaintiff herself, conducted by an investigator who went silent for months; (c) a closed compliance matter was resurrected as "still outstanding" the moment leverage was needed; (d) Plaintiff's own words and emails were distorted, disputed, or declared imaginary even as they sat date-stamped in the record; and (e) the information Plaintiff supplied in good faith — including her domestic violence history and confidential address — was disclosed, weaponized, and used against her. Morgan Stanley's HR and Employee Relations functions looked and sounded like employee protection; they operated as management protection.

***H. Interference With and Retaliation for Plaintiff's Protected Medical Leave (February–April 2024)***

88. On February 27, 2024, Plaintiff's surgeon (Dr. Cuellar) and neurologist (Dr. Conrad) recommended that she take time off work to allow her neck to heal from the December 2023 surgery: she was in severe pain and had started losing vision in her left eye due to occipital nerve impingement, and required a series of injections to allow the muscle to relax, which would take an estimated three weeks. Her physician recommended a return date of April 1, and Plaintiff applied for short-term disability for the time period. This was precisely the leave Plaintiff had told Employee Relations, in writing, eleven days earlier that she was afraid to take — because complex management would take and give away her book of business without her knowledge and approval while she was out. On February 27, 2024, Plaintiff notified her CSA, Jill Hughes, that she would be taking time off work to allow her neck to heal; Plaintiff tried to call Pawlowski to inform him of her medical leave, but he did not answer, and Ms. Hughes delivered a handwritten message to

Pawlowski, which she left on his desk, informing him that Plaintiff was taking disability and would be back April 1. Defendant's own EEOC position statement admits that Pawlowski was informed on February 27, 2024 — the first day — that Plaintiff was taking medical leave, and that Pawlowski spoke with Plaintiff by telephone on February 28, 2024. Plaintiff herself moved all of her client meetings to ensure everything was handled before she left, and sent calendar invitations for two pending client transactions.

89. On February 28, 2024, Plaintiff called MetLife to report her disability, to begin eight days later if she did not use her phone or computer. Her access to her computer and phone was shut off at that time. Because she had not yet confirmed her out-of-office notification would remain active, she asked the office to make sure it was set, in her message to Pawlowski. Her HR case number 830923B reflected her request for disability and, again, for her accommodations to be extended to work from home — the same request that had been pending since December 10, 2023 with no substantive response.

90. After Plaintiff left on leave, she received multiple calls from Pawlowski — on February 28 and 29, 2024, to her personal cell phone, while she was commencing protected disability leave — including a voicemail that he "didn't know what was going on." When Plaintiff returned the call (assuming a client emergency) and then received Pawlowski's return call on her personal cell, Plaintiff calmly explained that she was out on short-term disability leave and that she had informed him. Pawlowski again claimed to know nothing about it: he said he did not know what MetLife was and that he and the complex risk office did not know she was taking disability (though MetLife had not yet contacted the Firm the same day as her application — which is precisely why Plaintiff had called to notify him in advance); demanded to know why she was taking disability; grew angry and hostile; referred to Plaintiff as "my employee"; and claimed

Plaintiff had "violated [his] rights" by not informing him of her absence — by which he meant she had failed to call his personal cell phone with her private medical reasons, after the Firm's own phone investigation had instructed employees not to use personal phones for business matters. Pawlowski confirmed he had not a single client-related question. He ended the call by yelling "I hope you feel better" in a manner clearly meant to be distressing. After the phone call ended, Plaintiff was distressed and spent the following weeks of her medical leave unsure whether she would be fired when she returned.

91. Throughout Plaintiff's March 2024 medical leave, Plaintiff's out-of-office notification was not maintained — despite her requests. To the extent an automatic reply directing clients to Ms. Hughes was briefly active at the commencement of her leave in late February 2024, it did not remain active during her leave, and in any event it directed clients to a CSA who was not a Financial Advisor and who transferred out of the branch in early April 2024, after which clients' calls were routed to a phone line that no one answered. Plaintiff's clients continued to email and call and received no response; Plaintiff has multiple client emails confirming that no out-of-office notification was active during her leave. One of her clients passed away during this period and emailed with no response; Plaintiff was never informed when she returned and learned of the death only while reviewing her email. During Plaintiff's medical leave, Pawlowski told several of her clients — including clients Plaintiff had inherited from Ms. Timchenko — that Plaintiff was on an "extended vacation" and that he did not know when she would be back, when he had been told, in the message and directly, that she would return April 1. Several of those clients left within a week of Plaintiff's return. Plaintiff complained to HR about Pawlowski's conduct.

***I. May–October 2024: An Investigation of the Complainant, a Reprimand for Conduct the Firm Had Closed, a Resurrected Investigation, and an Accommodations File Closed While Plaintiff Buried Her Father***

92. In early May 2024, Morgan Stanley asked Plaintiff to meet with its internal investigator about the personal-device matter involving her former partner, Ms. Timchenko — the same matter Complex Manager Mason had confirmed closed, in person, in July 2023, without fine or further action. Between June 3 and June 5, 2024, Plaintiff was presented with a reprimand for signature by Pawlowski and Caresse Blevins. The Firm thereafter formalized the discipline in a Letter of Reprimand/Written Warning dated August 6, 2024, signed by Mason himself, for allegedly "exchang[ing] text messages with another employee from at least July 2020 through July 2022, related to trade related tasks for clients, business development ideas, and compensation." The Firm then required Plaintiff to acknowledge the Letter of Reprimand, which she did under protest of continued employment on October 24, 2024 — one week before she filed her EEOC Charge.

93. The Letter of Reprimand was retaliatory and pretextual, as its own content and chronology demonstrate. First, by its terms, the reprimand concerned messages exchanged with "another employee" — Plaintiff's own JPN partner — not with clients; Plaintiff was identified only incidentally, during the Firm's review of Ms. Timchenko's communications. Second, despite multiple requests, Morgan Stanley has never permitted Plaintiff to review the purported text messages, and the March 20, 2023 email the Firm characterizes as Plaintiff's "admission" was written and sent at the dictation of the Firm's own Senior Complex Risk Officer, John Perry, as the vehicle he prescribed for closing the matter. Third, the conduct at issue allegedly occurred between 2020 and 2022 — a period during which, for a substantial stretch, Morgan Stanley had

not issued Plaintiff a corporate device and its workforce was remote during the COVID-19 pandemic; Plaintiff has used a corporate phone since 2021 and adhered to Firm policy. Fourth, the Firm investigated the matter in 2022–2023 and confirmed it closed in July 2023, without discipline. Discipline issued only in 2024 — the investigator interview in the immediate wake of Plaintiff's February 2024 discrimination complaints; the signature demand within seventy-two hours of the "closeout" of her discrimination complaint; and the formal Letter of Reprimand dated four days after the parties' pre-charge tolling agreement took effect on August 2, 2024. Upon information and belief, similarly situated Financial Advisors who engaged in comparable personal-device communications, and who had not complained of discrimination, were disciplined contemporaneously with the Firm's review of their conduct or not at all — not a year or more later, timed to their protected activity.

94. On June 3 through June 5, 2024, Plaintiff received multiple calendar requests from Ms. Cho for a "closeout call" regarding the investigation of Plaintiff's February complaints. In the same period, Plaintiff was asked to sign the reprimand, presented by Pawlowski and Caresse Blevins. On June 4, 2024, Pawlowski emailed that a separately requested HR meeting was "in regards" to the phone investigation — the matter Mason had confirmed closed in July 2023. The choreography spoke for itself: the "closeout" of Plaintiff's discrimination complaint, a disciplinary reprimand of Plaintiff, and the resurrection of a closed investigation — all in the same seventy-two hours.

95. On June 6, 2024, on a follow-up call, Ms. Cho confirmed that Defendant did take Plaintiff's accounts and asserted that Defendant could do so because Plaintiff did not have a "PwC license" — a license Defendant has never identified or produced, and a rationale irreconcilable with the fact that Plaintiff had serviced the PwC-affiliated accounts for years under Defendant's

direct supervision. Ms. Cho further announced that her investigation had revealed "several erroneous items" — including that FINRA requires Plaintiff's address and overrides the North Carolina Attorney General's confidential address program. The investigation Plaintiff had requested into discrimination against her had produced, instead, findings against her.

96. Later in June 2024, Plaintiff emailed Monique Simmons in Human Resources and asked that HR simply provide notice before placing calls on her calendar. The record of what HR actually did is Kafkaesque: (a) an HR call was placed on Plaintiff's calendar while she was in the operating room having an ablation procedure — her calendar clearly stated she was out of the office that afternoon — and she declined the meeting and asked in an email for time to accept and that meetings not be placed while she was out of the office; (b) another HR call was placed on her calendar while she was out of the office the day after her father passed away — she again asked HR to stop placing meetings while she was out, declining while contacting her own clients to tell them her father had died and she needed to move their meetings; and (c) another HR call was placed one hour after she returned from bereavement leave, before her father's funeral. Plaintiff then received an email stating that her accommodations request was being closed "due to multiple attempts to have a discussion" with her and her supposed refusal to participate. Plaintiff had been in the accommodations "discussion" for two and a half years, and had followed every step and every documentation requirement the Firm ever gave her.

***J. September 2024 – June 2025: Benefits Cut Off Retroactively, Pay Docked Unilaterally, Continued Retaliation, and the Futility of Internal Remedies***

97. MetLife — which Defendant describes as its third-party administrator — denied Plaintiff's February 28, 2024 short-term disability claim. Plaintiff requested by phone and HR Case Management to use available sick and vacation days to cover the leave, per firm policy.

Defendant then retroactively redesignated Plaintiff's physician-directed medical leave as an unpaid leave of absence and converted her benefits from payroll-deducted coverage into a direct bill. By Defendant's own account to the EEOC: (a) in June 2024, the Firm refunded $865.31 in benefit deductions taken during her leave; (b) in July 2024, it direct-billed Plaintiff for nearly double full benefit premiums for the leave period, an amount the Defendant's HR team agreed was incorrect; (c) in September 2024, it cut off her benefits coverage retroactive to March 1, 2024; (d) on September 30, 2024, it refunded $3,303.92 in benefit deductions; and (e) on October 15, 2024, it unilaterally debited $3,215.35 from Plaintiff's paycheck. Plaintiff never authorized that deduction in writing or otherwise.

98. In September 2024, Plaintiff was informed that her short-term disability application submitted February 28, 2024 had been denied. Plaintiff's family's health insurance and prescription drug benefits were shut off — retroactively, without meaningful advance notice, and without any offer of COBRA continuation coverage. Morgan Stanley claimed Plaintiff had not paid premiums; Plaintiff's paystubs show that benefits premiums had been withdrawn from her pay bi-monthly, pre-tax, throughout the relevant period — deductions Defendant itself later refunded and then partially clawed back through the unauthorized October 15, 2024 paycheck debit. Plaintiff was also informed that her life insurance, dental insurance, short-term disability, and long-term disability insurance contracts had been cancelled without notice for the same stated reason. The retroactive cancellation of family health coverage — for an advisor with one son with Autism/special needs and another son treated for cancer in 2024, facts Plaintiff had disclosed to Employee Relations in writing in February 2024 — was, Plaintiff believes, an act of retaliation for her complaints to HR and an effort to force her to quit and find other employment with insurance

benefits for her family. Defendant's attempts to collect the direct-billed premiums, and the benefits cutoff, immediately preceded Plaintiff's filing of her EEOC Charge on November 1, 2024.

99. Through the fall of 2024, Morgan Stanley continued to transfer Plaintiff's clients to male advisors and continued to obstruct her request for accommodations — now accusing Plaintiff of doctoring her accommodations request form and demanding that she resubmit the paperwork for a fourth time. The Firm neglected the duties it owed to Plaintiff, interfered with her client relationships, and caused her significant financial damage.

100. On November 1, 2024, Plaintiff filed her Charge of Discrimination with the EEOC. The filing of the charge was itself protected activity, and Defendant's conduct thereafter — including its continued refusal to accommodate, continued account transfers, the denial of support staffing, and the conditions described below — was undertaken with knowledge of the charge.

101. On February 11, 2025, Morgan Stanley awarded Plaintiff Pacesetter recognition, and merit-based promotions to Senior Portfolio Manager and Vice President — presented by the Firm and by Complex Manager Curtis Mason himself. The same complex manager who had told another advisor that Plaintiff "couldn't handle her job" and "would not be at Morgan Stanley much longer" while handing him a client list, who had raided approximately $40 million from her book while she recovered from spinal surgery, and whose conduct Employee Relations had "investigated" and excused, formally recognized Plaintiff in February 2025 as among the Firm's top performers. Plaintiff achieved that recognition despite the loss of her CSA, the raiding of her book, the denial of every requested accommodation, and the sabotage of her client relationships during her medical leave. The award forecloses any conceivable performance-based justification for Defendant's treatment of Plaintiff — and confirms that Morgan Stanley drove out an advisor it was simultaneously celebrating.

102. In March 2025, following the resignation of support professional Jade Abney, Plaintiff was told that the Firm would not assign her a replacement CSA. Upon information and belief, male Financial Advisors in the Market retained functioning dedicated or partnered support coverage during the same period, while Plaintiff was relegated to pay $1,000 per month to a shared "pod" that did not provide functioning coverage for her practice — a continuation, after the EEOC Charge, of the same disparate support-staffing treatment about which she had complained since April 2024.

103. On April 1, 2025, Branch Manager Pawlowski — Plaintiff's accused harasser and, by Defendant's own account, the manager who had designated himself Plaintiff's "back up" — emailed Plaintiff, copying Poor, Vigliotti, Mason, and Moore, that clients of Plaintiff's had called him, asked him to take over their accounts, and referenced a matured CD whose proceeds were sent to their bank. Plaintiff responded in writing, on the same email chain, that the CD redemption was a call on the CD, occurred on February 3, was addressed in February, and was documented in the Firm's own 3D system — and asked whether Pawlowski was truly asserting that the clients had waited fifty-seven days to raise a matter that had already been resolved. The clients' accounts were thereafter transferred to Pawlowski himself. Defendant admits the transfer. A Branch Manager's absorption of a complaining advisor's client accounts — while her EEOC Charge was pending, on the strength of a stale and refuted premise, with the entire management chain copied — was a continuation of the pattern of stripping Plaintiff's book and a further act of retaliation.

***K. Constructive Discharge***

104. By the spring of 2025, the cumulative effect of Defendant's discrimination, targeting, retaliation, and refusal to accommodate had made it impossible for Plaintiff to service her clients, had adversely impacted her ability to support her family, and had caused a substantial

deterioration of her health. Her accommodations file had been closed; her support staffing had been eliminated with no replacement; her family's benefits had been retroactively cancelled; her pay had been docked without authorization; her book had been raided; and her own Branch Manager — the man who had pressured her to display her surgical incisions — was now absorbing her client accounts with the full management chain copied. Every internal channel had been exhausted and had failed.

105. On June 3, 2025, Plaintiff submitted written correspondence to Morgan Stanley resigning her employment. In that correspondence, Plaintiff expressly stated that the escalating pattern of discrimination, targeting, retaliation, and failure to accommodate her disabilities had made it impossible for her to service her clients, had adversely impacted her ability to support her family, and had caused a substantial deterioration of her health. Plaintiff further noted that she had complained repeatedly — both internally and through counsel — and had waited for Human Resources and Employee Relations to intervene, but that the Firm had instead circled the wagons and protected the management team.

106. Plaintiff's June 3, 2025 correspondence observed that her resignation would likely be welcomed by the very management team responsible for the misconduct, notwithstanding that she was one of the most decorated Financial Advisors in the branch and the complex — a circumstance that itself confirms the discriminatory and retaliatory character of Defendant's conduct. Indeed, Mason had told another advisor eighteen months earlier that Plaintiff "would not be at Morgan Stanley much longer" — while handing him a client list. No rational, non-discriminatory employer drives out one of its most decorated advisors; Morgan Stanley's management set out to do exactly that, and succeeded.

107. By correspondence dated June 5, 2025, Morgan Stanley confirmed that Plaintiff's separation from employment was effective June 3, 2025. On June 17, 2025, Defendant filed a Form U5 with FINRA concerning Plaintiff's registration.

108. Defendant deliberately made and permitted Plaintiff's working conditions to become so intolerable that a reasonable person in Plaintiff's position would have felt compelled to resign. Plaintiff's resignation was not voluntary; it was a constructive discharge and an adverse employment action attributable to Defendant.

## **COUNT I**
## **Violation of the ADA — Failure to Accommodate**
## **(42 U.S.C. § 12112(b)(5)(A))**

109. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

110. At all relevant times, Plaintiff was a qualified individual with a disability within the meaning of the ADA, and Defendant had knowledge of Plaintiff's disabilities and of her repeated requests for reasonable accommodation — beginning in December 2022, renewed on or about October 16, 2023, resubmitted December 10, 2023, renewed with physician-signed documentation on January 14, 2024, and pursued continuously thereafter — including a standing desk supported by her surgeon and a work-from-home arrangement of the kind routinely afforded to other Financial Advisors.

111. The requested accommodations were reasonable, would have enabled Plaintiff to continue performing the essential functions of her position, and would not have imposed any undue hardship on Defendant — a firm that routinely grants remote-work arrangements to Financial Advisors, that provided standing desks free of charge to advisors, operations staff, and support

staff in the complex without any accommodation request, and that had previously accommodated Plaintiff without incident. Indeed, Plaintiff offered in writing to pay for the standing desk herself.

112. Defendant failed and refused to provide the requested accommodations over a period of years; granted at most a temporary, medically inadequate three-month remote-work arrangement while leaving her renewed requests "under review" indefinitely; refused her October 2023 request in its AWL system on December 20, 2023 on the false stated ground of an "ongoing conversation," without notice to Plaintiff; failed to engage in the interactive process in good faith — instead subjecting Plaintiff to an endless, circular "process" of forms, resubmissions, and "discussions" scheduled during her surgery, the day after her father's death, and the hour she returned from bereavement leave; falsely told her she had never "submitted a case"; conditioned accommodation of her safety-related work-from-home request on disclosure of her confidential address and of sealed domestic violence proceedings; closed her accommodations file while she was on bereavement leave, blaming her for failing to "participate"; and thereafter accused her of doctoring her accommodations request form and demanded she resubmit the paperwork a fourth time — all in violation of 42 U.S.C. § 12112(b)(5)(A).

113. As a direct and proximate result, Plaintiff has suffered and continues to suffer lost compensation and benefits, lost earning capacity, physical injury and aggravation of her medical condition, emotional distress, humiliation, damage to her professional reputation, and other pecuniary and non-pecuniary losses. Defendant acted with malice or reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages under 42 U.S.C. § 1981a(b)(1).

**<u>COUNT II</u>**
**Violation of the ADA — Disability Discrimination, Hostile Work Environment, and Constructive Discharge**
**(42 U.S.C. § 12112(a))**

114. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

115. Defendant discriminated against Plaintiff in the terms, conditions, and privileges of her employment because of her disabilities, her record of disability, and because Defendant regarded her as disabled — including by stripping client accounts and revenue from her book while she recovered from surgery on the stated premise that she could not "handle" her job; publicly blaming her surgery, and scapegoating her, for the loss of a departing advisor’s clients; interrogating her about her surgeries and pressuring her to physically display her surgical incisions; penalizing her use of medical leave; and subjecting her to a hostile work environment culminating in her constructive discharge — in violation of 42 U.S.C. § 12112(a).

116. As a direct and proximate result of Defendant’s discrimination, Plaintiff has suffered and continues to suffer the damages described herein, and is entitled to compensatory and punitive damages.

**<u>COUNT III</u>**
**Violation of the ADA — Retaliation**
**(42 U.S.C. § 12203)**

117. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

118. Plaintiff engaged in protected activity under the ADA by requesting reasonable accommodations and by opposing Defendant’s discriminatory practices, including through her February 2, 2024 disability and gender discrimination complaint to Human Resources (memorialized in Defendant’s own "Hot Topic" intake record), her repeated internal complaints to

management, Human Resources, Alternative Resolutions, and Employee Relations, her November 1, 2024 EEOC charge and its amendments, and complaints made by counsel.

119. Defendant retaliated against Plaintiff because of her protected activity, including by removing client accounts and revenue from her book; threatening to falsify a FINRA customer complaint against her; issuing the reprimand presented in June 2024 and formalized in the August 6, 2024 Letter of Reprimand contemporaneously with the "closeout" of her discrimination complaint and the effective date of the parties' tolling agreement; resurrecting a closed compliance investigation; stripping her of CSA support; retroactively redesignating her leave as unpaid, cancelling her family's health, prescription, life, dental, short-term disability, and long-term disability benefits without notice and without an offer of COBRA continuation coverage, and unilaterally debiting her paycheck; accusing her of doctoring her accommodations paperwork; transferring her clients to her Branch Manager in April 2025 while her Charge was pending; and constructively discharging her, in violation of 42 U.S.C. § 12203.

120. As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered and continues to suffer the damages described herein.

## COUNT IV
## Violation of Title VII — Sex Discrimination and Constructive Discharge
## (42 U.S.C. § 2000e-2(a))

121. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

122. Defendant discriminated against Plaintiff in the terms, conditions, and privileges of her employment because of her sex, including by: removing client accounts from Plaintiff — whom management called "a girl" who could not "handle" her job — and directing them to male advisors, including an advisor with a known history of threatening and ~~sexually~~ harassing a female

colleague; dissolving her joint production arrangements against firm policy and awarding her specialty clients to unqualified male advisors; denying her the functioning administrative support afforded to similarly situated male advisors; and constructively discharging her, in violation of 42 U.S.C. § 2000e-2(a).

123. As a direct and proximate result of Defendant's discrimination, Plaintiff has suffered and continues to suffer the damages described herein, and is entitled to compensatory and punitive damages.

**COUNT V**
**Violation of Title VII — Hostile Work Environment**
**(42 U.S.C. § 2000e-2(a))**

124. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

125. Defendant, through its managers and supervisors, subjected Plaintiff to unwelcome harassment based on her sex that was sufficiently severe or pervasive to alter the terms and conditions of her employment and to create an abusive working environment, including demeaning and infantilizing sex-based comments, invasive interrogation regarding her body, her surgeries, and her history as a survivor of domestic violence, the disclosure of her legally protected home address and personal phone number, and the sustained campaign to strip her practice for the benefit of male advisors.

126. Defendant knew or should have known of the harassment and failed to take prompt and effective remedial action; the harassment was perpetrated and condoned by Plaintiff's own supervisors and management, and Defendant's Human Resources and Employee Relations functions protected the wrongdoers, investigated the complainant, and permitted the conduct to continue.

127. As a direct and proximate result, Plaintiff has suffered and continues to suffer the damages described herein.

**COUNT VI**
**Violation of Title VII — Retaliation**
**(42 U.S.C. § 2000e-3(a))**

128. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

129. Plaintiff engaged in protected activity under Title VII by opposing practices made unlawful by Title VII, including through her February 2, 2024 disability and gender discrimination complaint to Human Resources (memorialized in Defendant's own "Hot Topic" intake record), her repeated internal complaints to management, Human Resources, Alternative Resolutions, and Employee Relations, her November 1, 2024 EEOC charge and its amendments, and complaints made by counsel.

130. Defendant took materially adverse actions against Plaintiff because of her protected activity — including the account removals, the threatened falsification of a customer complaint, the reprimand presented in June 2024 and formalized August 6, 2024, the resurrected investigation, the loss of support staff, the closure of her accommodations file, the September–October 2024 retroactive cancellation of her family's insurance benefits without notice or a COBRA offer and the unauthorized paycheck deduction, the April 2025 transfer of her clients to her Branch Manager, and her constructive discharge — actions that would dissuade a reasonable employee from making or supporting a charge of discrimination, in violation of 42 U.S.C. § 2000e-3(a).

131. As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered and continues to suffer the damages described herein.

## COUNT VII
**Violation of the FMLA — Interference**
**(29 U.S.C. § 2615(a)(1))**

132. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

133. Plaintiff was an eligible employee, Defendant was a covered employer, and Plaintiff's serious health condition — her cervical spine condition, surgeries, and post-surgical complications — entitled her to leave under 29 U.S.C. § 2612. Plaintiff gave Defendant timely and adequate notice of her need for leave, including her written December 6, 2023 notice of surgery and her February 27–28, 2024 notice of medically directed leave through April 1, 2024 — notice Defendant's own position statement admits its Branch Manager received on the first day of the leave.

134. Defendant interfered with, restrained, and denied the exercise of Plaintiff's FMLA rights, including by: discouraging and chilling the use of protected leave (including management's steering of Plaintiff away from disability leave in 2021 in favor of an out-of-office notification, and its admonition that leave "wouldn't have been a problem" but for staffing departures) — a chill Plaintiff documented contemporaneously in her February 16, 2024 written complaint to Employee Relations, stating that management's raiding of her book was the primary reason she was concerned about taking disability leave; penalizing the taking of leave through the removal of client accounts and revenue while Plaintiff was recovering and on leave; failing to provide required FMLA notices and designations at any time, despite notice of a plainly qualifying serious health condition; demanding that Plaintiff justify her leave through a nonexistent internal "approval system"; contacting her repeatedly during protected leave to demand private medical explanations; failing to maintain her out-of-office notification and misrepresenting to clients that she was on

"extended vacation"; retroactively redesignating her leave as unpaid and cancelling her benefits, despite Plaintiff's request to utilize available vacation and sick days per firm policy; and failing to restore her to an equivalent position with an equivalent book of business upon return, in violation of 29 U.S.C. § 2615(a)(1). Defendant knew of its FMLA obligations, was told in writing of the leave and the feared reprisal before the leave began, and acted anyway.

135. As a direct and proximate result, Plaintiff suffered lost compensation and benefits and other monetary losses, and is entitled to damages, liquidated damages, interest, and attorneys' fees under 29 U.S.C. § 2617.

**COUNT VIII**
**Violation of the FMLA — Retaliation**
**(29 U.S.C. § 2615(a)(2))**

136. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

137. Plaintiff exercised and attempted to exercise her rights under the FMLA. Defendant retaliated and discriminated against her for doing so — including by the account-stripping campaign launched while she was recovering from surgery and out on leave, the hostile calls during leave, the false claims that no one knew of her leave, the June–August 2024 reprimand, the September–October 2024 denial of her disability claim, retroactive benefits cancellation, and unauthorized paycheck deduction, the April 2025 transfer of her clients to her Branch Manager, and her June 3, 2025 constructive discharge — in violation of 29 U.S.C. § 2615(a)(2). Defendant's violations were willful.

138. As a direct and proximate result, Plaintiff suffered lost compensation and benefits and other monetary losses, and is entitled to damages, liquidated damages, interest, and attorneys' fees under 29 U.S.C. § 2617.

## COUNT IX
### North Carolina Common Law — Intentional Infliction of Emotional Distress

139. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

140. Defendant's conduct, through its managers and agents — including the January 26, 2024 interrogation in which Plaintiff's Branch Manager pressured her to physically display her surgical incisions, extracted her history as a survivor of domestic violence, declared that someone should have "killed" her abuser, and asked why her father (then suffering from Alzheimer's disease) had not done so; the disclosure of her legally protected home address and personal phone number, putting her safety and her children's safety at risk from their abuser — made ten days after her written objection informed the Firm the disclosure was forbidden; the demands — twice made by Defendant without notice, in the middle of her workday — that she "prove" her victimization and produce proof and findings of fact from sealed domestic violence proceedings, and the stated intention to permanently identify her and her family as victims in her personnel file; the retroactive cancellation of her family's health and prescription benefits without notice or COBRA offer, with knowledge that her sons' medical needs depended on that coverage; and the scheduling of "discussions" during her surgery and her father's death and funeral, followed by the closure of her accommodations file for failure to "participate" — was extreme and outrageous, beyond all bounds of decency tolerated by civilized society.

141. Defendant's conduct was intended to cause, or was engaged in with reckless indifference to the likelihood that it would cause, severe emotional distress to Plaintiff, and it did in fact cause Plaintiff severe emotional distress, together with the physical deterioration of her health described herein.

142. As a direct and proximate result, Plaintiff has suffered and continues to suffer damages, and Defendant's conduct warrants punitive damages under N.C. Gen. Stat. § 1D-15.

**COUNT X**
**Violation of the North Carolina Wage and Hour Act — Unauthorized Deduction and Unpaid Wages**
**(N.C. Gen. Stat. §§ 95-25.6, 95-25.8)**

143. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

144. At all relevant times, Plaintiff was an "employee" and Defendant an "employer" within the meaning of the NCWHA, and the amounts Defendant paid Plaintiff — including salary and incentive compensation — were "wages" within the meaning of N.C. Gen. Stat. § 95-25.2(16).

145. On or about October 15, 2024, Defendant unilaterally deducted $3,215.35 from Plaintiff's paycheck — a deduction Defendant has admitted in writing — without Plaintiff's written authorization meeting the requirements of N.C. Gen. Stat. § 95-25.8 and 13 N.C.A.C. 12.0305, and without lawful justification. Upon information and belief, Defendant made or withheld other amounts from Plaintiff's wages in connection with its retroactive redesignation of her leave and its retroactive cancellation of her benefits, likewise without valid written authorization.

146. Defendant's deduction and withholding of Plaintiff's wages violated N.C. Gen. Stat. §§ 95-25.6 and 95-25.8. Plaintiff is entitled to recover the amounts unlawfully deducted and withheld, liquidated damages in an equal amount, interest, and reasonable attorneys' fees and costs pursuant to N.C. Gen. Stat. § 95-25.22. Defendant's violation was not in good faith, and Defendant had no reasonable grounds to believe its unilateral deduction complied with the NCWHA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant, and award the following relief:

(a) Back pay, front pay, lost bonuses, lost deferred compensation (including all unvested and forfeited deferred compensation and equity awards), lost trailing revenue and production-based compensation, the value of lost and cancelled insurance and welfare benefits, and all other lost wages and benefits, in amounts to be proven at trial;

(b) Compensatory damages for emotional distress, humiliation, physical injury and aggravation of medical condition, damage to professional and business reputation, and other non-economic losses;

(c) Punitive damages under 42 U.S.C. § 1981a(b)(1) in the maximum amount permitted by law and under North Carolina law, N.C. Gen. Stat. § 1D-15;

(d) Liquidated damages, lost wages and benefits, and other monetary losses under 29 U.S.C. § 2617;

(e) Unpaid and unlawfully deducted wages, liquidated damages, interest, and attorneys' fees and costs under N.C. Gen. Stat. §§ 95-25.8 and 95-25.22;

(f) Pre-judgment and post-judgment interest as permitted by law;

(g) Reasonable attorneys' fees, expert witness fees, and costs pursuant to 42 U.S.C. § 2000e-5(k), 42 U.S.C. § 12205, and 29 U.S.C. § 2617(a)(3);

(h) Appropriate equitable relief, including reinstatement or front pay in lieu thereof, and such injunctive relief as the Court deems just; and

(i) Such other and further relief as the Court deems just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted, this the 17th day of August, 2026.

**BETZ LAW, PLLC**

***/s/ Demian J. Betz***

Demian J. Betz
N.C. Bar No. 57639
615 South College Street, 9th Floor
Charlotte, North Carolina 28202
Telephone: 704-343-156
Email: demian@betzlawpllc.com
*Counsel for Plaintiff Elizabeth Hobson*

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Charlotte District Office**
129 West Trade Street, Suite 400
Charlotte, NC 28202
(980) 296-1250
Website: www.eeoc.gov

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 05/19/2026

**To:** Elizabeth Hobson
148 Spring Grove Dr
Mooresville, NC 28117
Charge No: 430-2025-00440

EEOC Representative and email: CORDNEY HARRIS
EQUAL OPPORTUNITY INVESTIGATOR
CORDNEY.HARRIS@EEOC.GOV

---

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 430-2025-00440.

On behalf of the Commission,

Digitally Signed By:Elizabeth "Betsy" Rader
05/19/2026

Elizabeth "Betsy" Rader
District Director

**Cc:**
Incident Location
Morgan Stanley Smith Barney, LLC. d/b/a Morgan Stanley
17505 West Catawba Avenue, Suite 300
Cornelius, NC 28031

Jennifer W Persico
Morgan Stanley, Legal & Compliance
671 North Glebe Road 13th Floor
Arlington, VA 22203

Josh Van Kampen
Van Kampen Law, PC
315 E. Worthington Ave.
Charlotte, NC 28230

Jason Kane
Peiffer Wolf
95 Allens Creek Rd Suite 1150
Rochester, NY 14618

Eric Spengler
Spengler & Agans, PLLC
352 N. Caswell Rd.
Charlotte, NC 28203

Please retain this Notice for your records.

# INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court* ***under Federal law****. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 430-2025-00440 to the District Director at Elizabeth "Betsy" Rader, 129 West Trade Street Suite 400, Charlotte, NC 28202.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 430-2025-00440 to the District Director at Elizabeth "Betsy" Rader, 129 West Trade Street Suite 400, Charlotte, NC 28202.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

## NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

### "Actual" disability or a "record of" a disability

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.
- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
- ✓ **Only one** major life activity need be substantially limited.

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.
- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.